## Case No. 16,702.

UNITED STATES v. The WILLIAM ARTHUR.

[3 Ware, 276.] [1]

District Court, D. Maine. Oct., 1861.

"BLOCKADE" DEFINED — CIVIL WAR — MUNICIPAL REGULATIONS—ATTITUDE OF NEUTRALS— CONSTRUCTION OF STATUTES.

1. A "blockade," as that word is understood by the law of nations, is an investment of a

[1] [Reported by George F. Emery, Esq.]

town of one belligerent by the forces of another.

2. Every nation of common rights may declare what shall be ports of entry and delivery, and participate in trade by law, and enforce their laws by such means and penalties as she pleases. If she places armed ships before them, this does not constitute a blockade, as understood by public law, but is a mere municipal regulation, though familiarly called a blockade.

3. A neutral, or neutrality, always implies three parties, two belligerents and a third, a common friend, all acknowledged as independent nations. But in a civil war there is only one party, insurgents are not acknowledged as a nation, but to foreigners they are mere malefactors.

4. The laws of the United States, of July 13, and August 6, 1861 [12 Stat. 255, 319], are purely municipal regulations, with which foreigners have no concern.

5. Where an intent is charged in a statute as constituting part of a crime, it must be proved as a fact.

6. The words "aid, abet, and promote" used in the law of August 6, 1861, are words of uncertain meaning, as to their intent, and in this law are to be taken in their largest extent.

In admiralty.

Mr. Talbot, U. S. Dist. Atty.
Mr. Shepley, for respondent.

WARE, District Judge. The facts in these cases are, in substance, as follows: John Douglass Merrilees, the claimant, was born in Aberdeen, in Scotland, in allegiance to the crown of Great Britain, which he has never renounced, but for the last fifteen months preceding the seizure, has resided in Wilmington, N. C. He there had his place of business, and there his family resided. On the 7th of August last, he purchased, in Portland, a schooner called the "Sarah Ann Roe," since called the "William Arthur," for the sum of $3,000, and took out for her a temporary register, from the British consul, in this place, as a British vessel. Merrilees proceeded to load her with about one fourth or fifth of a cargo, and on the 23d of the month, cleared and sailed for the island of St. Thomas and a market; on the same day, as she was sailing out of port, she was seized by the collector. A libel was filed claiming a forfeiture of both vessel and cargo, under the late act of congress, of August 6, 1861, c. 60, called the confiscation act. Subsequently another libel was filed, claiming a forfeiture under the act of July 13, 1861, c. 3, prohibiting all commercial intercourse between the loyal and revolted states. The ground of the seizure was that St. Thomas was only her ostensible, but that Wilmington was her real and secret port of destination.

An argument is raised in limine, that one of these libels is fatal to the other. I do not feel the force of this argument. The same act may be a violation of both laws, and if so, the vessel may be liable under both or either. Such a cumulation of forfeitures is not unfrequent in the revenue laws, and one law was never supposed to repeal or make void

the other. If so, there may be a libel under either or both. There may be a difference in the distribution of the proceeds of the forfeiture, if the vessel is condemned, but in this the claimant has no interest and no voice.

The first question presented in this case is, did the "William Arthur" sail from this port on a voyage to St. Thomas according to her clearance, or did she, under cover of that, secretly sail on a voyage to Wilmington. The one was a legal voyage, the other was, or at least might be, under either libel, an unlawful voyage. To prove that the former was intended and was the true object of her destination, her clearance and all the usual and regular documents are produced and the sworn answer of the claimant that the vessel and cargo were purchased with that intent and purpose. This is sufficient prima facie evidence, and throws on the government the burthen of proving, to countervail it, the truth of their allegations, that though the vessel sailed ostensibly on a legal voyage, she in her secret intention sailed on an illegal voyage and to a prohibited port. This the attorney for the United States has endeavored to do, partly from circumstantial and partly by direct evidence, and this lies partly in written and partly in verbal testimony. The vessel was purchased on the 7th of August last. Merrilees had then to provide her a master and crew. He went himself as master, and as it appears, had, previous to the purchase of a vessel, engaged J. F. Miller Derickson as sailing master to any one he should purchase, and left it to him to procure a crew. On the third day of August, four days before the purchase of a vessel, Derickson, the sailing master, wrote to Godfrey, born in Maryland, but then in New York, to engage him as mate   In this letter he directs him to bring with him a chart of the coast from Portland to Saint Augustine, and where to get it, if he had not one, and he would pay for it; to let no one see his letter, but burn it, and to direct to him at the United States Hotel, by the name of James F. Miller, and requests him to answer soon. Receiving no answer, he wrote again on the 7th, referring to his former letter, and requests him to answer as soon as he gets it, whether he will come without failing; directs him to call on G. E. A. Baker, to whose care his former letter was directed, where he will "see all," and to direct his answer to Jas. F. Miller. On the same day he wrote a third letter after he got an answer to his first, with a caution to let none of his letters be seen; directs him to stop at the Elm House, and not at the United States, to avoid suspicion, tells him his wages will be forty dollars a month, sends him twenty-five dollars and informs him that twenty-five more will be paid by Merrilees when he arrives in Portland, and urges haste. In all his letters Derickson gives no account of the voyage, but in his last, says that it is not a privateering enterprise. These letters have been verified by Derickson.

To this written evidence the attorney has added the parol testimony of Godfrey, who was mate of the vessel, and informer. He was a native of Maryland, but had sailed out of New York for eight or ten years, and came to Portland for the first time about four weeks ago, on the invitation of Derickson, whom he knew from his boyhood, they having been brought up near together. He signed mariner's articles to go in the Wm. Arthur. Derickson met him on the steps of the Elm House, whither he had gone to avoid suspicion, and then informed him that the voyage so mysteriously concealed in the letters was to Wilmington, North Carolina, but that they should take in part of a cargo and clear for St. Thomas. That at Wilmington they should take a cargo of naval stores and proceed to Nova Scotia. Derickson several times said that the blockade amounted to nothing, and was of no account. The same evening Derickson introduced him at the United States Hotel to Merrilees, and he apparently treating him (Godfrey) as a confidential man, informed him that the real voyage contemplated was to Wilmington. The witness does not remember that Merrilees ever named St. Thomas in connection with the voyage. Though in his cross-examination he is not certain that the destination of the vessel was first mentioned by Merrilees that evening, he adheres firmly and steadily through all his examination to this assertion, that he was informed of the destination of the voyage by Merrilees as well as by Derickson. This direct evidence is also confirmed by Hallowell, the hackdriver, who heard Merrilees say at the Ocean House, in Cape Elizabeth, that he came from Dixie land and was bound there, that he had bought a vessel at Portland, and was afraid it would be taken from him by the Yankees, and that Merrilees left the room cursing the abolitionists.

If, with the confirmatory testimony of Hallowell, Godfrey is to be believed, the intended voyage to Wilmington is proved. If such a voyage was intended, it of course would be masked under one that was legal. The claimant apparently feels this, and a regular attempt is made to break down the credibility of this witness. Nothing is offered against his general character for truth, but Derickson is offered to contradict him in the main fact. Derickson says that he never, at any time told Godfrey that a voyage to Wilmington was intended. Two witnesses, one of whom is Derickson, also swear that after the seizure, Godfrey said that Merrilees had better give him $500 or $1,000, to abscond and not appear as a witness in the case. Godfrey, on his reexamination, declares that he never said so. This is the amount of the discrediting testimony. It all rests on a vive voce examination and the credibility of witnesses. Against this verbal testimony we have the letters written by Derickson preparatory to the voyage, and engaging Godfrey for it. These cannot deceive by falsehood. In these letters why does Derickson begin by changing his name,

thus bearing a speaking falsehood on his forehead? Men do not act without a motive, and if they have nothing else to hide they never conceal their names. Why does he, to avoid suspicion, tell him to come to the Elm House. and not to the United States Hotel, if there was nothing that he wished to keep out of sight? Why, when it seems the voyage was already determined on, when his letters contain liberal pecuniary offers, does he offer but one word of explanation, that this is not a privateering enterprise. It seems to me that a man must be not only gravel blind but stone blind, not to see that here was a secret expedition intended, and that the direction to bring with him a chart of the coast from Portland to St. Augustine, points directly to a voyage somewhere in "Dixie land,"—that is, in the slave or rebellious states.

Before considering the laws applicable to these cases, as they present questions both novel and important, as well as in deference to the learned and able arguments on one side and the other, something perhaps ought to be said by the court, on the law of blockade and the rights of neutrals. The United States as an independent nation, has a right to declare what places shall be ports of entry and delivery, and confine all maritime trade to them. This they may do of common right as a mere municipal regulation, and no foreign nation may interfere in the subject. They may enforce such regulations by such means and with such penalties as they please. If before the places not privileged as ports of entry or delivery, or of foreign and coasting trade in order to enforce this regulation, they choose to place armed vessels, this does not constitute a blockade in the language of the law of nations. The right of the United States to establish the embargo of 1808 [2 Stat. 453], indefinite as to time as it was, and closing all the ports of the country, was never questioned by foreign powers. To such an arrangement, the term blockade does not apply. That only exists where the forces of one nation encompass the ports of another. A third nation then standing by, which takes no part in the war, has certain rights of communication and trade which are allowed by the belligerents. A blockade interrupts this trade and communication. When it is a question whether a nation, or an individual of that nation, has violated that blockade, or whether this is real or only nominal, a question of law or fact may arise, which will be decided by the law of blockade. But in this case only our own ports are shut.

A neutral or neutrality, always supposes three parties, two nations, each having an organized government, acknowledged by other nations, and a third, a common friend of both. This third has certain rights allowed by the belligerents, and if these are violated in respect to the nation or an individual, redress may be claimed under the law of nations. But in the present case, there is but one party known to international law, one party whose existence is acknowledged by all nations, viz. the United States. There is indeed here an insurrection. But insurgents do not, in international law, constitute a party having the rights of a nation. Foreign nations do not acknowledge them. Towards them they are simply violators of the laws, and are legally entitled to no more rights than other criminals. In the law of nations they are only malefactors. If Guernsey or Jersey, or any of the Channel Islands, much more if Yorkshire or Lancashire, which form part of the main land of the British empire. should abrogate all the laws of England, and set themselves up as an independent nation, would England consider them as having equal rights with herself, or as revolted subjects, guilty of the crime of treason, the highest crime known to her laws, and punished with the highest penalty? If a high functionary of another nation should acknowledge an equality, and offer to treat them as an independent nation, having the same rights in the commonwealth of nations as herself, especially if this was done immediately and in hot haste, would she consider this a doubtful or equivocal act, or as taking part with a revolted province? Let her own acts in the war of 1776 with this country answer this question. We at that time formed a part of the British empire and commenced a civil war to resist intolerable grievances, not so much in the amount of the grievances as in the principles advanced. France, with sharp eyes, looked on, and in the course of three years, so says the British cabinet, "formed connections, first secret and afterwards avowed, with the revolted colonies of America, and according to the acknowledged law of nations these connections may be regarded as a breach of the peace between the two crowns, and as a declaration of war on the part of the most christian king.[2]

This declaration emanated from the British cabinet, of which Lords Thurlow and Loughborough constituted a part, and clearly shew that in her understanding of the laws of nations, that revolted subjects are not acknowledged as a nation under that law. I think correctly. The practice of nations I know is not in all cases in harmony with the law. Rome extended her empire not by just war, as we now understand it, but by seeking on all occasions to take part with the minority against the majority, and finally reducing both to slavery, and perhaps some may think that England has followed the same policy in the East. But this I believe to be the law of the Christian world in the West. Believing this. the rights of blockade and neutrality have no application in these cases. The laws of July

[2] Response a la Expose de la Cour de France, written by Gibbon in French, for circulation on the continent of Europe. 3 Gibbon's Miscellanies, p. 295, and 1 Gibbon's Miscellanies, p. 156. This answer was generally admired for the terseness of the style and the solidity of the argument, and was attributed at the time to Lord Stermont.

13, and of August 6, are purely municipal regulations; as such I shall treat them. It is true that, in this country, an insurrection exists de facto, and upon its issue may depend the question whether North America will be one nation or be cut up into many. If we continue one, we shall give law not only to the continent and its adjacent waters, but shall have an equal, if not a controlling voice in giving maritime laws to the two great oceans that border upon us, and this may be a reason why the nations of Europe may look upon what is going on in America with more than common interest, and even with fear and jealousy. But the magnitude of the interests depending cannot alter the law.

On the evidence before detailed somewhat at length, the attorney for the United States has filed a libel under the act of August 6, 1861, c. 60, for a forfeiture of the vessel and cargo. The act is entitled, "An act to confiscate property used for insurrectionary purposes." In the operative words of the first section, it is provided that when "the laws of the United States are opposed by combinations of men too powerful to be suppressed in the ordinary modes, if any person shall purchase or acquire, sell or give any property of whatsoever kind or description with intent to use or employ the same, or suffer the same to be used or employed in aiding, abetting, or promoting such insurrection or resistance to the laws, or any person engaged therein; or if any person or persons being the owner or owners of such property shall knowingly use or employ, or consent to the use or employment of the same as aforesaid, all such property" is declared subject to seizure as prize, and as such will be subject to forfeiture for the uses declared in the act. If I understand the testimony in this case right, this vessel was intended for Wilmington, North Carolina, one of the places where the laws of the United States are opposed, and their execution obstructed by combinations too powerful to be suppressed by the ordinary means employed for that purpose. Merrilees, the claimant, was the owner of that property, both vessel and cargo. Some evidence was offered to show that one Blossom, of Wilmington, was the real owner, and Merrilees was a mere man of straw, and ostensible owner only, But the evidence is, I think, insufficient, and for the purposes of this trial, Merrilees must be considered as the real owner. And whether intended to be used in aiding, abetting, and promoting the insurrection is the only question which is open in the libel.

Merrilees, the claimant, was born in the dominions of the crown of Great Britain, and owes to that a natural allegiance. He there has his domicil of origin, but has acquired a commercial one in Wilmington. A commercial easily gives place to a natural domicil, and it has been argued that where one has been acquired, the first movement of a party to put off his acquired and resume his domicil of birth, the natural one takes the place

of one which is purely artificial. It is said that Merrilees had taken such steps, and that his rights, if they may be affected, are to be considered as those of a neutral. But without repeating what has been before said on the subject of neutrality, it may be remarked, that Merrilees had acquired a commercial domicil at Wilmington, that the vessel was purchased and loaded before he left the country, that the evidence of an intention of change of domicil is insufficient, and that he is to be treated as an American. If questions of neutrality arise in this case, he could have no advantage from them. The intention of a person can only be known from his declarations and acts. In the want of declarations, every one is presumed in law, as well as in common sense, to intend what will be the natural consequence of his acts. The legal intention, therefore, must have been that the vessel was to go to Wilmington, and there sell her cargo, consisting of consumable articles, and, as this is not proved to be a garrisoned town or place of arms, to have gone into the consumption of that place and the vicinity, and that the vessel herself was to go into any trade which was there offered, unless we take the specific evidence, that she was to take a cargo of naval stores for Nova Scotia. This is the intention which the law would impute.

The only question raised as to the intention, is whether sending goods of this nature into a vicinage included in the insurrection was intended within the meaning of the law to aid, abet, and promote the prevailing insurrection. These words "to aid, abet, and promote," are of cognate significance, and like all words of a general nature, are of large and somewhat indefinite meaning. They may be used in a stringent or restricted sense, and not only admit but require interpretation. When this is the case, we in the first place look to the law itself, to learn in what sense they are used. But this contains no word of particular limitation or general description to enlarge or restrict their scope. For a second rule, if the law is founded on the relations of things themselves, in other words, on the law of God, and is calculated merely to enforce the law of nature, and contains words of ambiguous or indefinite import, which require interpretation, we recur to the laws of nature, to the rules and precepts of natural equity to explain them. But if the law is purely arbitrary, if it does not command or prohibit what is right or wrong, in itself, intrinsically, but is so only under particular circumstances, we look to the will of the legislature itself, which is the sole judge of the expediency of suspending the laws of nations in this particular case. No other department of government has a right to interpose its judgment in this matter, and particularly the judiciary has not. Its simple duty is to explain the law, if necessary, and execute it according to the will of the legislature. This is a plain and obvious rule, and besides its intrinsic reasonableness, is confirmed by the wisdom and moderation

of the sage Domat. Lois Civilis, Liv. Preliminaire, tit. 1, § 3. To come within the law, an intent must be shown, for this is a substantive part of the law—and as before remarked, there is no evidence on this record that Wilmington was a besieged, blockaded, or garrisoned town, or that there was any assemblage there to oppose the execution of the laws of the United States. The cargo was, therefore, intended there to be sold, and to go into the consumption of that town and that vicinity. Was this to aid, assist, and promote the insurrection? The attorney of the United States must defend the affirmative of the proposition, for the intent, as before observed, is a substantive part of the law. It was not the purpose of the law to interfere with private charity, or acts of beneficence, and if supplies, of whatever kind, were sent to meet the wants of a relative or friend, it is not prohibited by the law. This is the interpretation which is natural and will be generally given.

If the legislature have made use of general terms, which require interpretation, and have used no words in the law itself, which will aid us in this, the first rule is that we must look into laws in pari materia for their interpretation, especially if these laws are recent; (2) to the mischiefs intended to be overcome or prevented, or the good to be obtained; or (3) we may look at the surrounding circumstances of historical notoriety, for without the aid of particular testimony the court is supposed to know these.

1. In recurring to laws in pari materia, the first law which occurs, is that of July 13, 1861, passed at the same session of congress, and very shortly before this. By this law all commercial intercourse between the loyal and the insurgent states is prohibited. If we are to take this as an indication of the meaning of the legislature, we should be inclined to take these words in the largest extent. The general character of the laws passed at this session, and particularly the large grants of men and money for carrying on hostilities, lead to the same conclusion. All laws relating to the same subject-matter would dispose us to give to these words the natural, and not a restrictive meaning.

2. The second medium of interpretation is the mischief to be suppressed, or the good to be obtained, for every law ought naturally to be interpreted so that the object of it should be accomplished and not defeated. The object of this law is to put an end to the insurrection. And this insurrection is against all the laws of the United States, and not one only. The insurgents deny the whole authority of the United States. They deny the rightful power of the government itself. The struggle is not then pro aris et foris, to have possession of them, but whether we shall have altars and hearths to contend for. When insurgents have thrown off all laws and all authority of government, they are not scrupulous as to the means of executing their pur-

pose. They avail themselves of any means in their power which will serve their turn, and those who oppose them must draw the sword and throw away the scabbard. What made even legitimate wars in ancient times so fierce and bloody? It was because the combatants knew that they were fighting not only for national independence, but for everything valuable that personally belonged to themselves, for their hearths and homes, for their wives and children, for their own liberty. Everything was spoils for the victors. The insurgents have no public treasury to go to to pay their followers. They pay only in promises, and their purpose must be that the conquered shall redeem these promises. The rich harvest of Philadelphia, New York, and Boston, would go far towards this. So the fillibusters, or buccaneers, as we are informed, being without resources of their own, promised their followers to reward them with the plunder and plantations of Cuba. In such case it is always vae victis woe to the conquered.

Nor did the legislature rely on the superiority of wealth or men in the loyal states. They had learned that William of Normandy, with 60,000 adventurers, subdued the whole of England, seized the wealth of the inhabitants, enriched his followers, and reduced the whole people to slavery. Three or four hundred years were hardly sufficient to raise the Saxons to the condition of free cultivators, and the nobility coming from the Norman law still continued a privilege class. In war, and especially in civil war, boldness and audacity is very apt to be successful. In civil war insurgents seize on every opportunity that God and nature put in their way to make advantage of it. If a legitimate government will not do something of the same kind, the people must take the consequences. Congress, after pouring all the resources of the country into the lap of the executive, both of men and money have shown a disposition to apply all legitimate means to put down the insurrection. The confiscation acts operating on the field where the insurgents recruit their armies, is a part of the means to curb and put an end to this insurrection, and the mischief which the law was intended to meet would not lead us to curtail it of any of its efficiency. It would rather tend to give those words their largest meaning.

3. A third mode of explaining law which is of doubtful meaning, is the surrounding circumstances. These which may be known by all, may by the court, without special evidence to prove them. The insurgent states raise for export, large quantities of cotton, less tobacco, and some rice and sugar. None of these, especially the first two, are food or drink, and of the last two the export is not great. But of provisions they seldom raise enough for their consumption, and of manufactures they have scarcely any. The deficiency of these supplies must be severely felt, and the obvious object of this act is not only to cut off the supplies of munitions of war for

men in arms, but of necessaries for the people at large.

On the common and well established principles and rules of construing restrictive laws, I can see no reason for taking these words, "to aid, abet, and promote," in a limited sense. All the reasons gathered from laws in pari materia, from the evils to be corrected by the operation of the law and historical circumstances, lead to giving them their fair and legitimate scope, and I do not feel authorized to affix a limitation to their meaning, when the legislature have given none. If words are to be taken in their natural and ordinary sense, condemnation of the vessel and cargo under this libel follows as a necessity.

A second libel has been filed against this vessel, founded on the acts of July 13, 1861. This act prohibits all commercial intercourse between the loyal and revolted states fifteen days after the president has issued his proclamation declaring that an insurrection exists. The president's proclamation bears date August 16, and this seizure was made on the 23d of that month. It is drawn on the assumption that the sixth section does not limit the fifth, but the former goes into immediate operation. But as I condemn the vessel under the first libel this makes an examination of the cause of forfeiture under the twenty-fifth section unnecessary.