Argued at Pendleton November 1, affirmed December 27, 1921.

## STATE v. HOWARD.

(203 Pac. 311.)

**Homicide — Evidence Held to Sustain Conviction of First Degree Murder.**

1. Evidence *held* sufficient to sustain a conviction of murder in the first degree, notwithstanding defendant's claim that he killed deceased during a fight.

**Criminal Law—Corpus Delicti is Death as Result of Criminal Act.**

2. The *corpus delicti* of homicide which must be established by evidence outside of defendant's confession involves proof that the person named in the indictment is actually dead and that his death was the result of the criminal act of some other person.

---

2. Definition of *corpus delicti* and necessity of proof, see notes in 78 Am. Dec. 252; 1 Ann. Cas. 823.

Criminal Law—Evidence Connecting Defendant With Crime Held Sufficient Corroboration of Confession.

3. Evidence that defendant went out in company of deceased in the latter's car and was afterwards found in possession of the car and claiming to own it and also in possession of the watch of deceased, and that the body of the deceased was found at the place defendant said he buried it, *held* sufficient to corroborate the admissions of defendant that he killed deceased, even if such corroboration required additional proof of defendant's agency, as well as proof of the *corpus delicti.*

Criminal Law—"Admissions" Against Interest Prima Facie Admissible.

4. An admission by accused against interest, as distinguished from a confession because it did not concede a guilty act is *prima facie* admissible and voluntary, unless shown to have been otherwise procured.

Criminal Law — "Confession" Presumed Involuntary Until State Shows Otherwise.

5. A confession which is actually or practically an acknowledgment of guilt is *prima facie* involuntary, and the state has the burden of showing that it was not induced by threats or promises of favor.

Criminal Law — Confession not Involuntary Because Induced by Question.

6. A confession of crime is not involuntary merely because it was not spontaneous, but was elicited by examination, even by severe cross-examination or by artifice.

Criminal Law—Examination Should be in Presence of Disinterested Citizens.

7. It is better for officers to examine one accused of a crime for the purpose of obtaining a confession from him in the presence and hearing of disinterested citizens, but the failure to do so does not render the confession involuntary.

Criminal Law—Written Confession Held Admissible.

8. A confession, made by accused to the prosecuting attorney and the sheriff while under arrest and being taken back to the place of the crime, and which was made in response to questions asked by the prosecuting attorney, but after the accused had been informed of his right to remain silent, and that his statements would be used against him, and which was signed by accused two days after he made the statements, so that he had had time to reflect thereon, is voluntary and admissible.

Criminal Law—Instruction Defining "Premeditated" Held Correct in View of Other Instructions.

9. An instruction that, "Premeditated means thought of beforehand, for any length of time, no matter how short," is technically

5. When confession sufficient to convict, see notes in 65 Am. Dec. 676; 10 Ann. Cas. 913; Ann. Cas. 1912B, 1249.

correct, and was not erroneous, where the court in other instructions defined deliberation and stated the elements of the intent to kill *necessary to make first degree murder.*

**Criminal Law — Instruction Credible Testimony of One Witness to a Fact is Sufficient is Correct.**

10. In a prosecution for murder, an instruction that the direct testimony of one witness entitled to full credit is sufficient for proof of any fact in the case, which is substantially a copy of Section 702, Or. L., was proper.

**Criminal Law—Admonitory Instruction Held not Erroneous.**

11. An instruction to deliberate soberly and solemnly on the verdict, but to have the courage to express conscientious convictions, was not necessarily prejudicial to defendant, but rather admonished the jurors to find a verdict in the face of what might be public opinion against the prisoner, and was one which it was within the discretion of the court to give.

**Homicide — Requested Instruction to Disregard Attempted Felony Held Properly Refused.**

12. Where the evidence showed the motive for the homicide was to obtain possession of deceased's automobile, a requested instruction that the jury should not consider any evidence of the commission or attempt to commit a felony by the defendant was properly refused, as taking from the jury the right to consider the motive which might have induced the homicide.

**Criminal Law — Requested Instruction as to Effect of Confession Held Too Broad.**

13. A requested instruction that every material allegation of the indictment must be supported by evidence other than the testimony or admissions of defendant goes further than Section 1537, Or. L., which provides that the confession is not sufficient to warrant conviction without some other proof that the crime has been committed.

**Criminal Law—Evidence of Corpus Delicti and Defendant's Agency Corroborates Confession.**

14. The corroboration of a confession is sufficient under Section 1537, Or. L., requiring some other proof that the crime has been committed, if there is other evidence of the *corpus delicti* and of the agency of defendant.

**Criminal Law — Requested Instruction Confession Alone was not Sufficient Held not Required by Evidence.**

15. In a prosecution for homicide, where the confession of accused was admitted in evidence against him, and there was abundant evidence outside of the confession tending to convict him, a requested instruction that the confession alone was not sufficient to convict was academic, and its refusal was not error, though it might properly have been given.

102 Or.—28

Criminal Law — Instruction on Right to Recommend Life Imprisonment Held Correct.

16. An instruction that the jury, if they found the verdict of murder in the first degree, might recommend imprisonment for life if under all the circumstances of the case they should be convinced this was proper was not objectionable, as depriving the jury, at least in part, of its right to recommend life imprisonment, since it cannot be conceived the jury would make such recommendation if it seemed improper.

From Malheur: DALTON BIGGS, Judge.

In Banc.

The defendant was indicted, tried and convicted of the crime of murder in the first degree committed upon the person of George R. Seeny, commonly known as George R. Sweeny. It was alleged that the offense was committed by the defendant on September 14, 1920, in the county of Malheur, Oregon, by striking deceased divers blows on the head with a piece of iron called a wrench. There is no question raised in the brief as to the sufficiency of the indictment and none as to the fact that defendant killed deceased with the weapon alleged in the indictment. The defendant as a witness in his own behalf admitted that he killed deceased, appropriated his automobile and watch, sank his body in the Owyhee River and subsequently took it therefrom and buried it where it was found in consequence of information furnished by the defendant.

The principal contention on the appeal to this court is that there is not sufficient evidence to justify a verdict of murder in the first degree. There are objections to the ruling of the court in admitting certain evidence and particularly an alleged written confession of defendant. There are also objections to the action of the court in refusing instructions requested by the defense and in giving certain instructions

excepted to by the defense upon the trial. All of
these matters will be further stated and considered
in the opinion.                                   AFFIRMED.

For appellant there was a brief and oral argument
by *Mr. Julien A. Hurley.*

For respondent there was a brief and oral argument
by *Mr. Robert D. Lytle,* District Attorney.

McBRIDE, J.—It may help to clarify matters to
state briefly the facts either expressly admitted by
defendant in his testimony or proved by such uncon-
troverted testimony as renders them morally certain.

It is a fact that on September 13, 1920, the defend-
ant and deceased were "dickering" about the pur-
chase of a Maxwell automobile by defendant and
that the negotiations had gone so far that nothing
remained to complete the trade except for defendant
to pay a certain amount of cash and give acceptable
security for the unpaid balance to the deceased.

It is certain that on the same date defendant pur-
chased at a store at Vale a large trunk, which he left
in the store until the next day (the day of the homi-
cide), when he got it and after going a short distance
in the country placed therein the body of deceased,
whom he had killed some hours previously.

It is certain that on September 12th or 13th de-
fendant had purchased and had in the machine a
heavy wrench with which the homicide was committed.

It is certain that defendant and deceased drove out
of Vale on the morning of September 14, 1920, and
that while some distance out of the city defendant
struck deceased at least two blows with the wrench,
thereby killing him.

It is certain that he placed the body of deceased in the rear part of the car, covering it so as to be secure from observation, and returned to Vale, got the trunk he had purchased, drove out into the country and forced the dead body into the trunk placed in the rear part of the machine, drove home, took members of his family riding with the trunk containing the dead body still in the car, and after remaining at home that night drove back towards Vale to what is known as the Palmer Ranch, where he had formerly worked, let the car stand there with the trunk containing the body still in it, until dark, and then took the body from the car, carried it to the Owyhee River, weighed it down with pieces of old iron and sank it in about four feet of water in the stream.

It is certain that on October 28, 1920, he took the dead body from the river, carried it a distance of several hundred yards and buried it in a garden, where it was afterwards found pursuant to directions given by him.

It is certain that he retained possession of the car, claiming that he had bought it.

It is certain that he took and kept the watch that deceased was wearing at the time of the homicide.

These facts are undisputed and were admitted by defendant on the witness-stand.

1. His defense, as stated upon his direct examination, is that deceased was unwilling to part with the car upon the terms which he had proposed and had demanded the full price, $650, in cash and upon defendant's stating that he could not do any better than to pay $250 down and the balance in installments, deceased began abusing him and his family, and that during the altercation blows were exchanged and in a

moment of excitement and anger defendant reached back behind the seat with his left hand, seized the wrench, changed it to his right hand, and struck deceased two blows, killing him instantly.

At the risk of being prolix we give his explanation in the language used by him on direct examination:

"Well, gentlemen of the jury, this trouble occurred as I will tell you as follows: First we were on a deal for a car, I and a man named Mr. Sweeny, and I came down here to Vale September the 13th, 1920, to complete this deal and receive the car. On arriving here I found that Mr. Sweeny had planned to give me a little different terms than he had before, or had agreed upon before, and I couldn't meet the terms, and Mr. Sweeny agreed with me the second time, and so we were out for a drive at the time this event occurred, and just following the details of the deal we became engaged in a quarrel. The quarrel was very short, not very many words spoken between either of us, and Mr. Sweeny accused me of being crooked, playing him false, making false agreements, trying to obtain articles for which I couldn't pay for, further accusing my father of being in false deals before and generally crooked in his dealings, called me several names I will not state here in the presence of ladies, one was liar, I will tell you, and a couple of other names. And when he called me these names I struck him a blow along the side of the face, the right side, and he struck me a blow in the breast as I still wear a mark, probably show you later, I have worn ever since, and when he done that I became so angry that I picked up a wrench and struck him on the head."

This was practically reiterated on his cross-examination, and even if believed by the jury, it would have fallen far short of making a case of self-defense, although it might have furnished a plausible argument in favor of a theory of manslaughter. But the im-

probability that the encounter occurred as the defendant says it did; that with no apparent reason an old acquaintance should heap upon him the abuse he claims as provocation for the blow that he says he struck; that he considered himself in danger from deceased while he was occupied in steering a moving car; that in such a struggle he should have had time to reach over the back of the front seat of the car, discover the wrench lying there, seize it with his left hand, transfer it to his right and strike the blow, are circumstances so intrinsically improbable that the jury might well have concluded that they never took place, and might well have been justified in adopting the theory that the defendant, who was afterwards found in possession of the car and watch of the deceased and claimed to own them, had purchased the wrench with the intention of using it as a lethal weapon and the trunk as a means of concealing the crime, and that the homicide was committed for the purpose of obtaining the property which defendant afterwards appropriated as the spoils of the crime. We are not authorized to go into a general comparison of the testimony given on behalf of the state and the defendant, but from the circumstances above detailed and from others unnecessary to set down, there was abundant evidence to justify the jury in finding the verdict rendered.

The facts above noted become important when considered in connection with that portion of our Code, Section 1537, which provides:

"A confession of a defendant, whether in the course of judicial proceedings or to a private person, cannot be given in evidence against him, when made under the influence of fear produced by threats; nor is a confession only sufficient to warrant his conviction,

without some other proof that the crime has been committed.''

2. It is contended in the able and plausible brief of defendant's counsel that there is an entire lack of proof that a crime has been committed outside of the confession of defendant; in other words, that there has not been sufficient proof of the *corpus delicti.* The controlling reason for the rule that the mere confession of a crime is insufficient to sustain a conviction arose from the fact that in some instances persons have been convicted upon such confessions and thereafter the supposed victims turned up alive. While these occurrences were infrequent, they were sufficient in number to cause the courts in the first instance, and later the legislative power, to require that such confessions should be corroborated by extraneous evidence that the supposed victim was actually dead and that the death had been occasioned by some criminal agency so as to preclude the presumption that it had happened through accident or suicide. It follows, therefore, that in cases of this character proof of the *corpus delicti* simply involves the establishment of the fact that the person named in the indictment as the victim is actually dead and that such death was the result of the criminal act of some other person. The principle is thus stated in *State* v. *Hand* (Del.), 1 Marv. 545 (41 Atl. 192):

"There must be a *corpus delicti.* That is, if a man openly confesses that he has killed another at a certain time, unless there is proof that a man was actually killed, even though the missing man may not come back, the confession amounts to nothing.''

See, also, 16 C. J., § 1578; *People* v. *Tapia,* 131 Cal. 647 (63 Pac. 1001); *Ruloff* v. *People,* 18 N. Y. 179; *United States* v. *Williams,* 28 Fed. Cas. 626; *Pitts* v.

*State*, 43 Miss. 472; *Commonwealth* v. *Webster*, 5 Cush. (Mass.) 295 (52 Am. Dec. 711).

3. Even if we add to the requirements above indicated the factor introduced by some decisions, that there must be some extraneous proof outside of the defendant's confession tending to connect him with the commission of the crime, the fact that defendant went out in company of deceased in the latter's car, and was afterwards found in possession of it and claiming to own it; the fact that he was found in possession of the watch of deceased; the fact that the body was found buried at the place he stated that he buried it; the fact that the trunk in which he claimed to have carried the body was found to have in it blood stains; all tend to corroborate his admissions that he killed deceased, as well as to furnish evidence of a motive for the perpetration of a deliberate murder.

We now come to the principal question raised in the case, namely, the admissibility of defendant's written confession. The circumstances attending the making of the confession are as follows: On December 7, 1920, defendant was arrested and taken into custody by Mr. Lee Noe, sheriff of Malheur County, near Carborton, Idaho, and taken to Cascade, Idaho, that night and the next day was taken by the sheriff in an automobile to Ontario, Oregon, where he was confined for the night. In the evening, this being December 8th, in answer to a question by the sheriff as to how he came to be in possession of the Maxwell car of deceased, the defendant stated that he had killed deceased in a fight near the bridge at Ontario. The sheriff testified that no promises or threats were made to procure this admission, and so far as the testimony indicates it was voluntary and no proprieties were violated in obtaining it. Upon defend-

ant's making this admission, the sheriff told him that he would call up Mr. Swangler, then the district attorney, and Mr. Walker, the court reporter, and the defendant could make his statement to them. The sheriff then telephoned Mr. Swagler and Mr. Walker, who came in response to the call, and later Mr. Farmer, city marshal of Ontario, came in. The defendant was then called into the marshal's office, where the following conversation was had by the district attorney, the sheriff and the defendant:

"Q. Now, Mr. Howard, Mr. Noe tells me that you want to make a full statement of this case.

"A. Yes, sir.

"Q. [Mr. Noe.] Now, if you will commence, George, from the time you left Palmer's and just as you told me, how you came in and made the deal, etc.

"Q. [Mr. Swagler.] You will understand in making this that it is your own free and voluntary confession, that you want to make a full statement.

"A. You want me to tell everything that happened in detail from the time I left Palmer's?

"Q. You understand in making this confession you are making it freely and voluntarily. There is no pressure being brought to bear on you or anything. You want to tell it.

"A. Yes, sir, I want to tell it just as briefly as I can so you will understand just 'exactly what happened.

"Q. All right."

The defendant then went on to state in substance that he had been informed that deceased had a Maxwell car for sale; that he wrote deceased, asking him to hold the car for a few days; that he received a return letter from the latter stating that he would do so; that later defendant went to Vale, about September 11th or 12th, and agreed with deceased on the price asked, $650; that he did not have the cash and

deceased asked him to get security; that he asked deceased if he would accept liberty bonds, which defendant claimed he owned, and deceased finally agreed to accept $800 in liberty bonds for the car; and that the deal was closed on that basis. The statement then continues as follows:

"So I told him I would give him the 800 Liberty Bonds, the eight $100 Liberty Bonds, and he agreed that that would be satisfactory. So the deal was made for the car. At that time the battery was down on the car so that it wouldn't run, so it was raining there for a day or two and we left the car in the shop for this battery to be charged up and a few other little things to be touched up, and after the battery was charged up we drove around Vale a little bit. I don't know just exactly where we went now, but we drove around a little around Vale, and then Mr. Sweeny was going to leave on a trip to Boise, expecting to get out on that afternoon train. So I drove him down here to Ontario in the car and while we were driving around here I mentioned a wheel that was squeaking, you know, one of those bands, and it seemed to make Mr. Sweeny very, very mad. Well, I mentioned about the wheel once or twice before when we were driving around, about the squeaking. He didn't seem to like it very well, seemed to think I was taking quite a bit on myself. When I asked him about the wheel down here it made him very, very mad. He got violent right immediately without scarcely any more being said. Out here at the corner of the bridge we got to talking about it. I tried to reason with him about the wheel, I didn't think it was any serious damage done any more than to get it fixed. His temper seemed to be rising higher and higher and he struck me a blow in the neck, knocked me almost out of the car. He was driving the car himself. He stepped out of the car and walked around, I was just about two thirds out, couldn't realize what was going on, and he came around the car.

I got the door loose and stepped out and I couldn't stand solid then and he walked right up to me and I supposed he was going to attack me again, so I attacked him first and he struck me a couple of more blows and I struck him one or perhaps two before I struck him one in the neck and he fell, apparently that broke his neck. And after that I stood there and thought about it for a few seconds, trying to decide what I should do, or what I shouldn't do, and it dawned on me and I took the body right down on the bank above the bridge and pushed it off in the edge of the water and came back to the car. His watch was on the ground. I picked it up and put it in my pocket and drove away as quick as I could get away, drove back through Vale, gathered up what few things I had to get and left town as quick as I could.''

Further, in answer to questions by the district attorney, defendant made the following statement:

''Q. When did you turn those Liberty Bonds over to him?

''A. Here at Vale.

''Q. What did you do with the Liberty Bonds afterwards?

'' A. I left them on his person.

''Q. You mean after you had killed him and put his body in the river you left the Liberty Bonds there?

'' A. I touched nothing at all.

''Q. What did you do with the watch?

''A. I just picked it up. It is at Mr. Ackerman's in Garden Valley where I have been staying.''

The defendant then told a fantastic story about how and where he got the Liberty Bonds which he claimed to have given in exchange for the car. The narrative is too long to be inserted here and was improbable in all respects and practically impossible in some. It is now admitted by the defendant to have been false in many particulars, and especially in respect to the Liberty Bonds. At the conclusion of this narrative,

which was carried on by means of questions and
answers, the district attorney said to the defendant,
among other severe strictures on his story:

"You have lied a whole entire story. You have lied
to Palmer and you have lied here. Tell us just what
the facts are. Come across and make a clean breast
of it. Start out and tell the whole facts, the truth.
Now where did you kill him?"

To this, defendant answered, "Out on the road
there." Thereafter the examination continued as fol-
lows:

"Q. How far out of Vale?
"A. I think about a mile.
"Q. Where did you put the body?
"A. I hauled it in the car.
"Q. Where did you put it afterwards?
"A. In the river.
"Q. In the Malheur River?
"A. Not in the Malheur.
"Q. What river did you put it in?
"A. In the Owyhee.
"Q. That very afternoon, wasn't it?
"A. Yes, sir.
"Q. And you killed him there and you never had
any bonds, did you?
"A. No, sir.
"Q. No bonds at all?
"A. No, sir. I have got a couple of bonds, not
what I told you.
"Q. You killed him for that car, didn't you?
"A. You might say for the car. We had a quarrel
is what—
"Q. George Sweeny never hit you first at all?
"A. Yes, sir, he did.
"Q. George Sweeny wouldn't hurt a flea and you
know it. You killed Sweeny that afternoon and it
wasn't because Sweeny hit you, because you killed
him just a short distance out of Vale, there, didn't
you?

"A. Yes, sir.

"Q. Just shortly after you had driven out?

"A. Yes, sir.

"Q. You never did come back to Vale and stay there the night of the 15th at the Drexel Hotel?

"A. No, sir.

"Q. And you had your stuff in the car when you started out?

"A. Yes, sir.

"Q. And you threw him in the Owyhee River. Just tell us where you put him in the Owyhee River.

"A. Right across from Palmer's water wheel, just above the wheel.

"Q. Just above the wheel at Palmer's water wheel; and you did it at night?

"A. Yes, sir, same night I got there.

"Q. That very night of the 15th?

"A. Yes, sir.

"Q. You didn't kill him with your fist?

"A. No, sir.

"Q. What did you hit him with?

"A. I hit him with a wrench.

"Q. What did you do with the wrench?

"A. The wrench is still in the car, I guess, now.

"Q. You put him above Palmer's water wheel. Do you know that body is found?

"A. Yes, sir, you have just now told me.

"Q. And you killed him because you wanted that car. You didn't have any money, that was all bosh, just a few dollars in the bank?

"A. Yes, sir, a few dollars.

"Q. And you didn't have these Liberty bonds you have been talking about?

"A. No, sir.

"Q. What did you kill him for? You killed him to get that car?

"A. Yes, sir.

"Q. A mile out of Vale there, isn't that a fact?

"A. Yes, sir.

"Q. And you struck him on the back of the head?

"A. Yes, sir.

"Q. That is where it appears there, it is right on the back of the head there you struck him?

"A. Yes, sir.

"Q. And you put him in the back of the car?

"A. Yes, sir.

"Q. Did you cover him up?

"A. A little bit; yes, sir.

"Q. And you took him out there and put him right above the water wheel at Palmer's that night?

"A. Yes, sir.

"Q. What time of night did you do it? About what time of night was it when you got there?

"A. I got there in the afternoon.

"Q. Got there late in the afternoon?

"A. No, it wasn't so very late, probably 1 or 2 o'clock.

"Q. Was that the time you put the body in the water?

"A. Yes, sir.

"Q. You waited till night?

"A. Yes, sir.

"Q. Where did you leave your car that afternoon?

"A. Standing out in the yard.

"Q. Anybody around?

"A. Some of the ranch hands around, nobody came around the car.

"Q. You dumped it in at night?

"A. Yes, sir.

"Q. What time of night?

"A. Probably 9 or 10 o'clock.

"Q. The body was in the car while it stood around there?

"A. Yes, sir.

"Q. Did you meet any rigs on the road?

"A. No, I don't believe I did. I passed two men on horseback.

"Q. Did you follow a straight road, or did you turn?

"A. I followed a straight road right out from Vale, right out. I passed the hotel man up above town a little ways. I had forgot to pay my bill, I stopped to pay him.

"Q. You passed him?

"A. I believe I passed him.  Anyway he was carrying the mail.

"Q. Did you hit him [deceased] more than one blow?

"A. I believe I hit him twice.

"Q. Was it a very heavy wrench?

"A. It is a steel wrench.

"Q. He never hit you at all?

"A. No, sir.

"Q. What kind of a wrench is it?

"A. It is a double-end wrench, steel wrench.  It is what they call an N wrench, I believe; it is double-ended.

"Q. Have you really known Sweeny all your life?

"A. Yes, sir.

"Q. You killed him having known him all your life just to get that car?

"A. Yes, sir, that must have been.

"Q. Has it haunted you ever since?

"A. Well, you can know about how it has haunted me.

"Q. Did he topple out of the car, or just sag down?

"A. Just sagged down.

"Q. Did you get any blood on the car?

"A. I don't believe so.

"Q. You never had to wash it?

"A. No; no more than to wash the bottom of the floor out.

"Q. Where did you tell Sweeny you was going with him when you got him in the car?

"A. I didn't tell him I was going anywhere in particular.

"Q. Just going for a ride?

"A. Yes, sir."

Later on in the narrative, which continued for some time, the following occurred:

"Q. Is there anything more that you want to tell us, George, about it?

"A. I don't know as there is.  I don't believe there is anything more.

"Q. The last story—

"A. As you have said, was false.

"Q. And the last story you have told is the absolute truth?

"A. It is the absolute truth. You know it is the absolute truth. All I have told the sheriff before is false. All that I told you in the first place is false. My story as I have told it to you now is true. You know that to be a positive fact.

"Q. I believe your story that you told last.

"A. And about that jewelry. If anybody has got anything I have told you the absolute truth on that. They have never obtained it from me. If they have got a single piece of anything belonging to him."

This statement was made December 8th, but the reporter was unable to extend it that day. The defendant was taken to Vale the next day, and on December 10th Mr. Lytle, district attorney elect, received the extended notes and in company with two private citizens and the jailer went to the jail, where the transcript was read over to defendant and he was asked to make any corrections he desired. He suggested none except a change in the name of a locality. In regard to what took place before the defendant signed the paper, Mr. Lytle testified as follows:

"Before I read this to him I asked him if he had made a statement in the presence of these gentlemen named at Ontario; he said that he had. I asked him if he had made that statement freely and voluntarily; he said that he had. I asked him if he made it knowing that it could be used against him; he said that he had; and I had examined this statement then and noticed that it was in the form of questions and answers. I asked him how it happened that this was in the form of questions and answers, and his statement was that, 'We thought we could get down to the facts better if they asked me questions,' and I asked him if his

answers were freely and voluntarily given and he said they were.

"Q. Now, did you or any of the gentlemen present after you had read this transcript make any promise, or hold out any inducement or hope of reward, in order to get him to sign this paper?

"A. No, no, we did not.

"Q. Any one present make any threats?

"A. No.

"Q. Anything said other than as you have detailed it?

"A. After I had read this entire transcript I repeated my question, I asked him if that was the statement that he had made, and it was, and I asked him if the statement, asked him again if the statement was made freely and voluntarily, and he said it was. I asked him if the statement had been made as the result of any promise expressed or implied, or induced by fear or otherwise; he said it was not. I then asked him if he was ready and wanted to sign this statement. He was seated on one side of the table, I was seated on the other, the rest of the gentlemen off in other parts of the room, and after asking him if he desired to sign this statement, he said, 'Yes, I might as well, as I can't do any more harm than I have done.'

"Q. And did he sign it?

"A. He signed it.

"Q. Turn to page 49, is that signature Mr. Howard's, the defendant's?

"A. That is the signature he appended to the statement at that time.

"Q. You saw him sign it?

"A. I did.

"Q. Then this witnessing clause, when was that typed on that?

"A. I typed that on that page just before going over to the sheriff's office.

"Q. Now after this was signed by Mr. Howard, was there anything said to Mr. Schnur, or Mr. Jones, regarding their signatures as witnesses?

"A. They were present and saw Howard affix his signature to this statement. I asked them if they would sign as witnesses.

"Q. And did they do that?

"A. They did.

"Q. Whose name appears on the first line under the witnessing clause?

"A. Phil Schnur.

"Q. You saw him sign his name there?

"A. I did.

"Q. And the next one?

"A. Thomas Jones. The first name is abbreviated, Thos.

"Q. Now, turning to the last page there, was that typewritten matter called to the attention of the defendant at or about the same time?

"A. At the same time.

"Q. Just tell the jury what was done and said with reference to that sheet of paper.

"A. One statement in the last portion of Howard's statement was somewhat contradictory to the balance of the statement. I asked him if that statement was true and he said it was not; it was contradicted by the rest of the statement in the last nine pages of his entire statement; so I had had intimation that that was the case and had prepared this affidavit in the event the defendant would desire to sign it, and to be sworn and make his oath, so at the time we finished the reading of the statement, before he had signed his first statement I read this last numbered page.

"Q. Now, just what form that is in?

"A. That is in the form of an affidavit.

"Q. You read that to him?

"A. I read that to him.

"Q. Before or after he signed the main statement?

"A. Before he had signed the main statement.

"Q. So that it was all in his mind when he signed it?

"A. It was all in his mind at the time of his signing the statement.

"Q. All right, go ahead.

"A. Then after he had stated his willingness and wish to sign I placed him upon his oath and I am a notary public; and he then signed the statement and this affidavit.

"Q. Now, were there any witnesses also to this affidavit?

"A. The two gentlemen, Phil Schnur and Thomas Jones, who witnessed the statement, were also witnesses to the affidavit.

"Q. And that was all done at the same time and a part of the same transaction?

"A. Yes, it was all together.

"Q. And on the evening of the tenth of December, 1920?

"A. Yes."

4. *Prima facie,* an admission against interest is always admissible both in civil and criminal cases. Such admissions are not classed with confessions when they do not go to the fact of guilt. For instance, in the present case, defendant's first statement to the sheriff that he had "killed Sweeny in a fight," was not a confession, because it did not concede a guilty act. This distinction while founded in clear logic is sometimes lost to sight in legal discussions and the same rules are applied to evidence of admissions of facts from which guilt may or may not be inferred as to those statements which necessarily imply an acknowledgment of guilt. The distinction is thus stated by an eminent text-writer:

"An admission is distinguished from a confession by the fact that the term 'admission,' in criminal matters, relates to matters of fact that do not involve a criminal intent, and a confession is an acknowledgment of guilt. The distinction between confessions and admissions must always be maintained, from the fact that admissions are always admissible in evidence under an exception to the rule excluding hearsay evidence, provided such admissions are made against in-

terest, while a confession must be affirmatively shown to have been made under conditions which would not induce a false statement.'' 2 Wharton's Cr. Ev., § 622a.

We call attention to this distinction here for the reason that there is evidence of a number of statements made by the defendant before and after the making of the written confession, which while evidentiary in character are not confessions of guilt. The statement made to the sheriff, above noted, and subsequent statements as to where defendant had buried the body did not involve any admission of guilt and were *prima facie* voluntary, unless shown to have been otherwise procured.

5, 6. On the other hand, a confession which is actually or practically an acknowledgment of guilt is *prima facie* involuntary and imposes upon the state the burden of showing that it was not induced by threats or promises of favor. The confession introduced here is of that character. If true, it was an admission of the guilt of defendant to the extent of premeditated murder for the purpose of gain; and therefore it was the duty of the state to produce such evidence as should satisfy the trial court in the first instance that it was not the result of promises made to defendant or by putting him in fear, so as to overpower his will and cause him or tend to cause him to make a false confession. A confession is not involuntary merely because it is not spontaneous. It may be elicited by examination and even by severe cross-examination or by artifice, if there is nothing in the means used to put the party examined in a state of fear or to excite in his mind a hope of leniency. We rely solely upon our prosecuting and peace officers to ferret out and detect crime and bring

to justice those committing it, and it is their duty
to use all means consistent with law and fair and
humane dealing with persons accused, to obtain evi-
dence by which criminals may be identified and crime
punished.

7, 8.   In the present instance, while we are far
from commending the language used by the district
attorney to the defendant and while an examination
of this character would better have been made in the
presence and hearing of disinterested citizens, we are
not able to say that the court was wrong in its de-
cision that neither fear nor favor induced the defend-
ant to make his statement.   It was made shortly
after the arrest of defendant and while he was being
taken with reasonable expedition to the place where
the crime could be inquired into.   The defendant was
given the option of silence, if he so desired.   In ad-
dition to this he had two days from the time he made
the statement until he signed it, in which to reflect
upon what he had said.   Before the statement was
read to him at Vale he declared in answer to interro-
gations that he made it voluntarily, and after it was
read he reiterated that declaration.   Under these cir-
cumstances we are of the opinion that the ruling of
the court admitting the confession in evidence was
not erroneous.   Its weight and sufficiency were for the
jury to determine in connection with the corroborat-
ing circumstances shown by the state and the denials
and explanations offered by defendant.

9. Error of the court is predicated upon this ex-
cerpt from one of the instructions:

"Premeditated means thought of beforehand, for
any length of time, no matter how short."

This definition is sustained by many authorities
which will be found collated in 6 Words & Phrases

under the title ''Premeditated.'' It is technically correct, but in the present instance it does not stand alone. The court instructed the jury that in order to constitute murder in the first degree there must be deliberation, premeditation and malice, and in defining deliberation and premeditation used the following language:

''Deliberation means a plan or design formed in the mind in cool blood, when the reason is not swayed by passion.

''To constitute murder in the first degree it is necessary that the design to take life should be formed and matured in cool blood, and not hastily upon the occasion, and it must be the result of a deliberate and premeditated act in pursuance of a design formed and matured when the perpetrator is master of his own understanding and after time and opportunity for deliberate thought.

''A design to kill formed in the midst of a conflict, when reason is obscured by passion, does not make a homicide murder in the first degree, although the slayer has at the time enough reason and reflection left to enable him to know that he is about to take, and to intend to take, the life of his adversary.''

These instructions, taken in connection with the one objected to, sufficiently define deliberation and premeditation.

Error is predicated upon the giving of the following instruction:

''If the state has established beyond doubt all of the elements of the crime of murder in the first degree, as defined to you, and all the material allegations of the indictment, as set forth in these instructions, your verdict should be, guilty as charged.''

The instruction seems unassailable and the objection proceeds upon the theory of defendant's counsel that there was no evidence to justify submitting to

the jury the question of murder in the first degree, in which view, as already shown, we do not coincide.

Error is also predicated upon the giving by the court of the following instruction:

"There has been a purported confession of the defendant introduced in evidence in this case, and you may consider this confession along with the circumstances surrounding it, and give it such weight as you may think it is entitled to under all the circumstances introduced in evidence. . You may also, in connection with this confession, consider the evidence introduced for the purpose of corroborating the same, as well as any explanation which has been made or attempted by the defendant."

The objection is evidently based upon defendant's theory that the confession was inadmissible. As we are of the contrary opinion, the objection must be overruled.

10. The next objection is to the giving of the following instruction:

"The direct testimony of one witness who is entitled to full credit is sufficient for proof of any fact in this case."

This is substantially a copy of Section 702 of the Code and was entirely proper.

11. Error is predicated upon the giving of the following admonitory instruction:

"In conclusion, gentlemen, I admonish you to clear your minds of all prejudice, and deliberate soberly and solemnly on your verdict, because it is one of the most solemn verdicts that it will ever be your duty to return. But when you have reached your conclusion have the courage, gentlemen, to express those conscientious convictions in the verdict which you shall render in this case."

We are unable to see anything necessarily prejudicial to defendant in this instruction. Its tendency, in the no doubt excited state of the public mind occasioned by an atrocious murder, was rather to admonish the jurors to find a verdict courageously in the face of what might be public opinion against the prisoner, than otherwise. It is usually held that cautionary instructions may be given or refused in the sound discretion of the court: *State* v. *Megorden,* 49 Or. 259 (88 Pac. 306, 14 Ann. Cas. 130).

12. Error is predicated upon the refusal of the court to give the following requested instruction:

"In order to prove malice there must be some other proof than mere proof of killing. In this case there is no allegation in the indictment that the killing was effected while defendant was engaged in the commission of a felony, and therefore in this case you shall not consider any evidence of the commission or attempt to commit a felony by the defendant, if any, in support of the crime of murder in the first degree."

The vice of this request lies in the fact that it proposed to take from the jury the right to consider the motive which might have induced defendant to kill deceased. The fact that defendant after the homicide was found in possession of the property of deceased and claiming to own it was strong evidence that the homicide was committed for the purpose of gain. A man had been killed; defendant was found in possession of the fruits of the crime, claiming them as his own and making false statements as to how he came by them. All these were facts to be considered by the jury in determining the probable motive for the homicide.

13. Error is predicated upon the refusal of the court to instruct the jury as follows:

"I instruct you that every material allegation of the indictment must be supported by evidence other than the testimony or admissions of defendant, before you can render a verdict of guilty in this case."

This requested instruction goes further than the statute. The Code, Section 1537, provides that:

"A confession of a defendant, whether in the course of judicial proceedings or to a private person, cannot be given in evidence against him, when made under the influence of fear produced by threats; nor is a confession only sufficient to warrant his conviction, without some other proof that the crime has been committed."

14. We take it that the corroboration is sufficient, if there is other evidence of the *corpus delicti* and of the agency of the defendant in the commission of the crime, both of which abundantly exist in the present case.

15. Error is predicated upon the failure of the court to give the following instruction:

"A confession of the defendant alone is not sufficient to warrant a jury in returning a verdict of guilty."

There was no state of facts disclosed in the evidence upon which this instruction could be based. There was abundant testimony outside of his confession tending to convict the defendant, and the instruction was therefore purely academic and not applicable to the case presented. Perhaps it would have been just as well to give it, but the failure to do so could not possibly have prejudiced defendant.

A request for an instruction that the alleged confession was not voluntary and should therefore be disregarded was properly refused, as above pointed out.

16. After instructing the jury as already recited, to the effect that if it found that all the material allegations of the complaint had been proved, it should return a verdict of guilty as charged, the court went on to say:

"You may, however, if you find a verdict of murder in the first degree, recommend imprisonment for life, if under all the circumstances of the case you should be convinced this is proper."

It is earnestly insisted that this instruction took away from the jury at least a part of its right to recommend imprisonment for life, by reason of the use of the words, "if under all the circumstances of the case you should be convinced that this is proper." We do not see what right is thus taken away. If the jury, considering all the circumstances, thought it proper, it could make the recommendation. It is unthinkable that a jury would so recommend life imprisonment, if such recommendation seemed improper. The instruction objected to is also supported by precedent: *People* v. *Brick,* 68 Cal. 190 (8 Pac. 858); *People* v. *Murback,* 64 Cal. 369 (30 Pac. 608); *People* v. *Jones,* 63 Cal. 168.

This seems to dispose of all the controverted questions in the case and while it is always an unpleasant duty to participate in a proceeding the result of which is to impose upon a fellow being the extreme penalty of the law, we feel fully assured that in the present instance the trial was fair, the defense ably conducted and the final result fully justified by the evidence adduced. This being the case, the judgment of the Circuit Court must be affirmed, and it is so ordered.

AFFIRMED.